Good morning, Your Honors. Juliana Drouse for Petitioner Joel Alcox, who is present in the courtroom, and my associate Tim Finnegan, who is also present in the courtroom. May it please the Court, the issue presented here today is whether Mr. Alcox will be allowed to have the merits of his petition decided. There has been no hearing in the federal court to determine whether he is entitled to the innocence to proceed with his petition. Mr. Alcox has presented solid, credible, and unrebutted evidence establishing a reasonable doubt as to his guilt or innocence. And he has also exercised due diligence in getting that evidence before the court. Can I ask you about the due diligence for a second? So basically the thrust of the relevant part of the district court decision and the respondent's Mr. Alcox essentially didn't do anything for some period of time, two years or whatever it was from the date of the effective date of AEDPA until some date in 1998. So what's wrong with that? Okay, what's wrong with that? It's twofold. Number one is he was in custody. And he was, first you have, well, let me go this step by step. Let me get to, maybe ask the question a little bit more specifically. I think what the district court was basically trying to say is that, well, Mr. Alcox did some stuff in 1998 that ultimately resulted in him finding all this evidence. Why didn't he do it two years earlier? So that's really the question. If you look at his testimony at the evidentiary hearing when AEDPA was enacted, he did begin again. I mean, prior to that he had tried. And he decided what he needed to find to help him.  And that he would look for biological family to assist him. And the reason why he didn't think that the adoptive family could help was? He was, you have to look at the facts. I mean, he was adopted when he was 13. His adoptive family rarely visited him at the time. He hardly saw them. His relationship with. There was also maybe some question about them not having financial resources. And they absolutely did not have financial resources. When he finally did get the courage to bring that up to the Alcoxes, would you help me You can help me. They did. And eventually they found Ms. Sharon Tissue, who then got the ball rolling. And then things developed. The most crucial development then being that when Rick Lothry waived attorney-client privilege and allowed me to have access to his attorney's file and I compared that file with Mr. Beeley's file. That's when you found all the recorded conversations, basically. Which were not only the recorded conversations, but the interviews of, I'm sorry, her name escapes me right now, but the defense investigator who in fact interviewed the alibi witnesses. And it was interesting, he's now Judge Voicy in Santa Barbara, but he was Mr. Lothry's public defender at the time. And he was more than happy to turn over. To me, he said he had been waiting for a long time to be able to do this. But he couldn't. He couldn't give that information over to Mr. Alcox's defense attorney at the time because it was a violation of attorney-client privilege. And as soon as Mr. Lothry waived that, it became available and opened the door to us to getting so much information. And that information only grew and grew and grew. I mean, after only part. Let me get back to this first period, though. Because I mean, basically, I think, again, the district court's decision on due diligence really turns on the period between April of 96 and whatever the date, January 98, whatever the date is. And so basically what you're saying, I think, what you're saying just now is that it took Mr. Alcox a while to sort of get up the courage to do what he needed to do. Is that due diligence? That's really the question, I think. That is due diligence when you consider the circumstances of him being in jail. First of all, in jail, you can only make collect phone calls. He was very limited in who he could call. So, Matt, the district judge said, well, he could have written to his former lawyer and asked for his file because he knew he had a problem with the alibi witnesses. And he could have gotten some information about that by getting his former lawyer's file. He could have. He could have written to his former lawyer to get the file, and he didn't do that. But by that point, his former lawyer had been so totally discouraging in telling him, absolutely, we are not going to put on, we cannot put you on the stand. You have to go with your confession. These alibi witnesses will be totally discredited. When did, I thought the former lawyer had died by the time Ed Pitt took effect. He had, as a matter of fact. So if, and the first opinion from this court says you only consider April 96 on, if Mr. Alcox had written his lawyer then, it would have come back saying no such person. Well, it might have gone to his lawyer's wife who had taken over his firm. And he might have gotten the file, I mean, to be totally frank with you. But even if he had gotten the file, there was almost nothing in there. Even as to, there were, he didn't even have all of the police reports that Judge Boise had gotten in discovery when he was representing Mr. Lothry. Only a scattering of those police reports were in there. Mostly, Mr. Bealey's file consisted of the preliminary hearing transcript, at which he was not the attorney. So what could we say, and we, the problem here is that the district court judge adopted the magistrate judge's report and recommendation and said for that 18 months, about 18 months, he did nothing. What would, and we have to deal with that. Right. All right? You do. So, what would be your suggestion or argument for how that should be handled? How that should be handled is number one, considering that he was in the prison where he could not- The magistrate judge's report says, okay, I acknowledge he was in prison, he didn't have access to a computer, he had very limited phone availability, and taking that into account, he still did nothing. Well, he did contact, if you look at Mr. Alcox's testimony at the evidentiary hearing, he contacted not only Salvation Army, but other sources to try to find. Although, unfortunately, we didn't get into what exactly the other sources were, but it was more than Salvation Army to try to find biological family. And then finally, he got the courage to talk to Pat Alcox to say, I need, I need somebody, I need somebody out there to get- He did say, I mean, when I read the transcript, I mean, he did say, there was a question. And in 1996 and 1997, when you were at Soledad, or even up until now in prison, do you have access to a computer? And this is your question, and so what did you do regarding the claim of the alibi witnesses? What did you do to get the information that you would need to file a petition? And then he answered, I needed somebody outside to help me. I needed somebody who'd go and find, in a bracket, witnesses, and then talk to them, interview them, and give them, and give written statements. I tried it on my own at first, I tried the Salvation Army, and so forth. They lacked total resources for doing such a thing, and so I knew I needed to contact my biological family. Perhaps they could help me. So is that enough? I think that is enough. What else could he have done? That's the other question. What else- No, I mean, the magistrate, I mean, I just threw out, you know, he could have written to his lawyer. Well- He could have written to his- As part of- The old firm. What he could have, and then, like I said, what he would have gotten was this empty file. And that wouldn't, that would not have helped him find- So he could have asked his, he could have asked his adoptive parents to help him out. Yes, but as I stated before, that was not easy thing for him to do, considering the circumstances of his adoption and his relationship with his adoptive parents at that time. As far as the lawyer's file is concerned, your point, though, is that, so first of all, we're talking about due diligence to get evidence to support the claim. The claim isn't that he had alibi witnesses. The claim is that his lawyer didn't investigate the alibi witnesses and lied to him about them. And there was nothing in the lawyer's file that would have told him that, right? There would actually be two claims. First of all, we have to remember that, it's also true in federal court, but it's particularly true in state court. The state will not entertain successive petitions. So you have to put all of your claims in one petition. He had two claims. In state court, you have a separate claim that I am actually innocent. I should not have been convicted. And you can get it reversed on that. That's what he thought was his strongest claim, because he knew he was actually innocent. And he knew that Rick Lothry knew that. And then the second claim was, the reason why I was convicted was because I did not have effective assistance of counsel. My lawyer did nothing to- My point is, is that if he had gotten the lawyer's file, it wouldn't have helped him at all, as far as the second part of that, because the whole point was the file had nothing in it. Correct. Correct. And he would have to have something more to explain why nothing was in there. That, because there are two prongs to Strickland. One is, my lawyer did nothing, and two is, there's prejudice. If he had done something, look at what he would have found, look at what he could have done. Well, the lawyer did do something. He considered the alibi witnesses. Pardon me? He considered the fact that there were alibi witnesses. When you look at all of the evidence as to what the lawyer did, this is what the lawyer did. The lawyer went to the DA and said, well, what about the alibi? Even, I don't even know if he did that. I mean, he went to Mr. Alcox and he said, well, the district attorney tells me that they can totally rebut and impeach all of these alibi witnesses. And in fact, in fact, if you look at all of the evidence, including what's in Sergeant Hite's file, the investigating officer, there was nothing, there was nothing to impeach them, absolutely nothing. So, if he had done any investigation whatsoever, he would have found out that fact. I mean, he was so bad, I'm sorry, but, you know, I've been working on this case for a long time, so I am very invested in this, but he was so bad, and I shouldn't point, I've been told that in the past, but he was so bad. You have to talk a little quieter. Okay, I'll go back. He was so bad that one of the crucial witnesses against Mr. Alcox at trial, Carolina Gonzalez, not only did he conduct no investigation regarding her, he didn't cross-examine her. Not one question. Now, go figure, where is, that's how bad it was. That's how bad it was. Now, the alibi witnesses, in fact, what I did find in the file, surprisingly, were a few of those little notes, you know, when you get a phone call that so-and-so called. Like a phone message slip. A phone message slip, correct. When we, and finding the alibi witnesses was not easy. They were all in the Air Force at the time of the incident, shortly discharged, and when they were discharged, they went home. One went to Missouri, Tennessee, Florida. I don't remember where the others. And we were told, yeah, we, you know, Mr. Dougherty in particular says, yeah, I called and I never got a return phone call. Lawyer. Right, I called Mr. Bealey and I never got a phone call from him. The only person who interviewed me was Mr. Lothary's investigator, and that information, unfortunately, could not have been provided to Mr. Alcox. So, do you think, I mean, there should have been an evidentiary hearing on whether or not he could get through the Schlepp gateway for the time period, and under what Supreme Court authority could we actually order a hearing as to whether he could meet the requirements of the Schlepp gateway for excusing the late filing? Okay. There's several, Ninth Circuit authority, Lawson versus Soto, which I know that you are familiar with, and then we have the House case, which I think is really important, right on this. I mean, when you, let's go back to Judge Garcia and what he decided. And when he granted the writ. He did it on ineffective assistance of counsel. He did, which was really very interesting. Then he was reversed by the Court of Appeal. He was reversed, and that was stunning, in an opinion which I think is so contrary to established law, but that goes to the merits, which we are not arguing right now. Okay, I'll stop. There's no need to talk about the Court of Appeal opinion. Except for he did, I found it interesting. He did it on ineffective assistance of counsel, not the innocence part. The history of that is quite interesting. When we began the evidentiary hearing in the Santa Maria Court, Santa Maria Division of the Santa Barbara Superior Court, after the order to show cause in the Traverse and all of that was filed, we were ordered by Judge Garcia that we could not get into ineffective assistance of counsel. All we could do was the actual innocence claim. After all of the evidence was presented to the court, and we were, we did briefing on that, we got an order from Judge Garcia saying, well, now I want briefing on ineffective assistance of counsel. And my first sentence in my brief in response was, well, we didn't get to have a hearing after this, so I would ask for a hearing, but here is my argument, and then we won on that. Now, he didn't find, he did not grant the petition on actual innocence, but the state standard for granting a petition on actual innocence is far different than the Schlupp standard. More severe or less severe? Much more severe. It has to be to an absolute certainty of innocence. If I can get back to what I think Judge Wardlaw's question was, so what, is there a standard for what it takes when you're in federal court on a federal habeas to get an evidentiary hearing on the Schlupp gateway, and if so, what's the standard? There is, and that is that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. That's the standard for prevailing. I'm talking about the standard for getting an evidentiary hearing. Getting a hearing. Just getting a hearing. Given how, I'm trying to pull all the Supreme Court decisions on these issues together in my head right now, I think in Martinez, there's some circumstances where you can get a hearing, and so which Supreme Court decision would allow us to order a hearing on this? May I consult with my associate for a moment? Actually, we're both a little confused because we do not think that there is a different standard that in order to get a hearing, you have to present evidence. This is McGuigan and House, and that would make it more likely than not that no reasonable juror would have found the defendant guilty had it been presented. Would have found. It's the same standard to get a, I would think it would be a lesser standard to get a hearing. I would hope so. I hope you're right. Do you still have to show diligence though for, to get to the shelf? No, it's a gateway. It's a gateway to, because you have to. You don't have to show diligence. No, you have to go back to what the purpose of habeas corpus is, and it's to do justice. It's to write wrongful convictions. To make sure that the innocents are not imprisoned. And so, no, it's a gateway. It allows people who can show that they are actually innocent to have a way so that they won't. To get to the merits of their claim. And the merits of the claim here, raised in the habeas petition, is ineffective assistance of counsel and. Right. That's it? Well, if. You get to the gateway, you get to the merits, what are the claims that are going to be litigated? Ineffective assistance of counsel. That if he had had effective assistance of counsel, there is no way he would have ever been convicted. You wouldn't be arguing actual innocence? Well, we would still. Well, in federal court, you do not get a petition granted on actual innocence alone. Just gets you through to the merits. Yes, it gets you through to the merits. You have to have a constitutional claim. And unfortunately, which when I speak to high school audiences and other people, they don't understand how actual innocence cannot be a grounds to get habeas granted in federal court. But it doesn't seem to be. But here, I have not seen a case with a stronger argument that a client received ineffective assistance of counsel. So the other way to get to the merits is if we were to find due diligence under the statute and you get. Correct. Correct. Just the merits. Right, correct. Okay. Okay. You're over your time, and I'll give you a few minutes for rebuttal, but maybe we should hear from the government. Thank you. Thank you. From the state, or is it the warden? I'm not sure. DHE. Good morning, your honors. Deputy Attorney General Jason Tran on behalf of respondent. May it please the court. I'd just like to respond to a few points made by counsel and some questions asked by the court. First of all, the US Supreme Court does require a showing of diligence to prove actual innocence. Perkins specifically says that, and I quote from Perkins, a federal habeas court faced with an actual innocence gateway claim should count unjustifiable delay on a habeas petitioner's part as a factor in determining whether actual innocence has been reliably shown. So it's a factor, it's not a requirement, from what you just read. Well, it's a factor that should be considered, according to Perkins. Should be considered in determining whether actual innocence has been shown. Exactly. Okay. How about in getting a hearing? Well, this court posed the question, is there any US Supreme Court authority for that? And I have found none. However, this court has recently issued a decision, published decision in Stewart v. Kate, that denied an evidentiary hearing because the evidence proffered did not meet the SHRP standard. And in this case, we have the same situation. The evidence is not reliable, definitely not credible, and that's just setting aside the diligence inquiry. That alone dooms the claim of actual innocence as an exception to the statute of limitations. Another subject matter brought up by counsel in the court is the focus on the time frame between 1996, April 1996, and January 1998, when petitioner finally- He would meet this test for due diligence. Correct. So the only period that was of concern to the district court was that 18 month kind of period from the passage of AEDPA and when he contacted his January of whatever it was. Wouldn't it be the April 19, no, you had a year, right? From when, if you were federal- The year ran from April 96. Right. So it was passed, but it gave you a year to file. Exactly. From April 24th, 1996 is when AEDPA was enacted. Right. After that, petitioner had one year. Till 1997. Exactly. April 24th, 1996. So shouldn't we be looking at from the day before his petition would be filed in 1997 to 1998 for the diligence period? Because after 98, he was found to be diligent. So wouldn't it be that one year, not two years? I don't think so, Your Honor, because the statute of limitations was enacted in 96 and requires diligence. And that's the whole reason it was enacted. It gave petitioners one year, more than enough time. But at the same time, it required diligence. Petitioners who were not diligent and then allowed that one year period to elapse would then be time barred. So it doesn't make sense, and it definitely runs counter to the spirit and purpose of AEDPA, to say that diligence is not required until after the one year period expires. And I want to- So he's not, he's relying on the exception that when you reasonably should have discovered that you had a claim, right? Is that right? Yes. The extended, the provision in the statute that allows for an extension of the statute of limitations. Exactly, Your Honor, I'm referring to 2244D1D. Yes, and so his claim as well, I didn't really learn that I had the basis for ineffective assistance of counsel claim until much later, right? Until after he obtained- After the statute ran. Exactly. Right, so one of the questions in that provision is, did he act diligently in, I guess, trying to gather the facts that would allow him to at least make a non-frivolous petition, right? I mean, does California tolerate frivolous petitions? No, California does not tolerate frivolous petitions, but he could have filed a non-frivolous petition. How? Had he acted- Because we know the district, we know the Superior Court judge said, was it the Superior Court judge who said you need an affidavit in one of them, one of the proceedings in state court? Yes, sure, but had he filed a petition earlier, could have gotten the same ruling earlier, and then could have found evidence earlier. That's the whole, I think, gist of the problem here is- One of the points that your opposing counsel made is that you don't get to file a whole bunch of habeas petitions in state court, you have to file one. You've got this ability to file, the right to file a freestanding innocence claim in state court, right, so far. And that since he could only file one petition, it's not enough that he could have filed one little mini-petition here and maybe found out stuff for that earlier. He had to gather his evidence for the whole thing, and that couldn't possibly have been done within the time that we're talking about. What's wrong with that argument? What's wrong with that argument is it focuses on gathering evidence. The statute actually doesn't say that. 2244D1D says, could a factual predicate for a claim have been discovered with due diligence? Not- What's the factual predicate for the claim? There are several factual predicates for his ineffective assistance claim. One is that he had an alibi.  The claim is that his lawyer screwed up by not investigating the alibi witnesses and by lying to him about them. That's the claim. The claim, he knew he had an alibi. The claim isn't that he had an alibi because the claim that he submits in federal court, which is the claim that 2241D1 is talking about, is the federal constitutional claim, which is a claim of ineffective assistance of counsel. And so the only way he can support that claim is by getting evidence, the factual basis to show that his lawyer was ineffective, not just that he had alibi witnesses, but his lawyer didn't do what he was supposed to do. Well, Your Honor, I respectfully disagree. And that's because- I'm just talking about what the statute says. Sure. I understand the claim is ineffective assistance. And he needed factual predicate- For both parts. For both the deficiency part and for the prejudice part. Sure. And my only point is that he could have discovered these factual predicates sooner had he acted diligently. By doing what? Starting on April of 1996, by doing what? Starting April 24th, 1996, as the district court pointed out, he could have done what he actually did later in 1998. He could have done that, but let's say that was something that he didn't feel was necessary at that time. He could have done other things besides calling the Salvation Army. He could have, as I think pointed out earlier, he could have contacted his trial attorney. Sure, his trial attorney was deceased at the time. Yes, but his practice or his files were still in the possession of his wife who was also an attorney. The point was that he didn't, there was nothing in the file because the attorney didn't do anything about contacting the alibi witness. And that's not true because even appellant, I'm sorry, petitioner concedes in his reply brief that counsel's file did contain police reports of the witnesses, of alibi witnesses. Didn't contain any evidence about contacts. And that's, again, the federal claim is a claim of ineffective assistance. If he had filed a habeas petition saying, grant habeas corpus because I had an alibi, he gets laughed out of court. It's not a viable federal habeas claim. You have to show ineffective assistance. He needed to establish, he needed to have some evidence that the lawyer hadn't contacted the alibi witnesses. You're not going to get that from the file. Sure, but he also had to show prejudice to support an ineffective assistance claim. Right, right. And the problem with that, the wall he runs into with the prejudice problem is that he had a confession. He had a confession that he committed the crime and it was. So, are you adopting the proposition that if a defense lawyer knows that his client confessed, it's okay for him to throw up his hands and say, well, it's a loser, we don't do anything? Because I'm here to tell you, as somebody who practiced criminal defense, that nobody in their right mind who is worthy of calling themselves a criminal defense lawyer would do that. Absolutely, I agree with your Honor's statement. In fact, trial counsel would agree with that statement because in a letter written by trial counsel to petitioner, he said he would try to contest the admissibility of the confession. Now, unfortunately for the defense, that failed. And so the confession was admissible. And if you read it, it's clear why it's admissible. It was not coerced at all. So petitioner runs into that problem. But another thing that petitioner could have done, he could have contacted several other attorneys. He had an attorney at the preliminary hearing before trial. He had another attorney for his state appeal. He could also have contacted the state bar to reach out to them, perhaps find- I thought his appellate attorney sort of poo-pooed the idea of an ineffective assistance of counsel claim. And I don't know if that's what his appellate counsel did. I don't- I think I read something in the record about that. I might be wrong, but I thought I had. I don't recall that, Your Honor, but appellate counsel is obligated- Or he discussed with him the possibility of filing a habeas petition. Perhaps. I don't know if specifically it was a petition about ineffective assistance of trial counsel. I don't know if that was what petitioner wanted appellate counsel to do. But my point is, he could have contacted other people. He tried to- I read a little part of his testimony that really wasn't fleshed out much. But he did try. He says, I needed somebody on the outside to help me. I needed somebody who could go and find witnesses, and I put it in brackets, and then talk to them, interview them, and give written statements. I tried to do it on my own at first. I tried the Salvation Army and so forth. They lacked the resources for doing such a thing. And so I knew I needed to contact my biological family. And if that was his intention, he could have done it sooner. And he admits that his mother had some of his legal materials. And his mother eventually reached out to a biological relative, a relative of his, that set into motion all the events that led to finally filing a federal habeas petition in 2008. So all these events could have been triggered a lot earlier had he been diligent. There's no explanation whatsoever of him doing anything besides contacting the Salvation Army before doing what he eventually did that successfully got him habeas petitions filed in the state courts. So, and his burden of proof here. Diligence has to be proved by the petitioner, and he has failed in that burden. Could you address, I just want you to address sort of the merits of the Schlepp issue. Where is Lothary today? Where is Lothary? Yeah, where is he today? I believe he's still in prison. He's in prison. Yes. And what is on the tape recordings? What information was on the tape recordings? You mean the tape recordings of the conversations between Lothary and the petitioner? I think that's what was recorded in the jail, right? Yes. And those recordings show Lothary accusing Sanjay Patel of the shooting. And of course, all this evidence is cumulative to the same type of evidence presented at trial. One of the defense theories was that Sanjay Patel was a shooter. In fact, there was a 911 call admitted to evidence about that. And the jury rejected it by convicting petitioner. So I'm not sure where that evidence would get petitioner. First of all, it's not newly. I didn't hear all of the additional material that he's uncovered since then. So you can't really rely. I mean, that's the whole point of an actual innocence gateway claim is that there's additional evidence that would have changed things if it had been known at the time or heard at the time. It has to be additional, but also new evidence. New evidence. Exactly. And the jury didn't hear the identical evidence, correct? But they heard evidence of identical substance. They heard witnesses. You're saying this would have been cumulative, basically? Yes. Yes. They heard witnesses. They heard testimony. They heard 911 call from, I believe there was even an admission of Sanjay Patel's statement to police. I think it was the 911 call from Sanjay Patel telling police, yes, I did it. And still the jury found that not credible. So the last point I'd like to make. I think there was something about the beginning of the tape that was of the conversation at the jail. The reaction, the initial comments of Lothery that he acted surprised in some. And Lothery is very crafty. And it was apparent from evidence that Lothery knew that they were being monitored. In fact, Lothery testified at the state evidentiary hearing that he knew there were monitoring devices, surveillance devices installed conspicuously in the jail cells. So Lothery had a self-serving motive to blame Sanjay Patel, to engage in these kind of conversations blaming Sanjay Patel for the shooting because it would exonerate Lothery as well. So that evidence definitely is not reliable to me to show. Later on, what did Lothery stand to gain by saying that Alcox was not present? He didn't stand to gain anything by that statement alone. But that's not what he said, though. He said, you weren't there. Sanjay Patel was the shooter. So how about in his declaration later on? Well, his declaration is not credible either. At the state evidentiary hearing where he was testifying about the substance of what he said in his declaration, he actually admitted that he lied to the police, that he kept changing his version of the events, and that he even said, you know, you could change my declaration to fit the version of the events. He actually testified to that. So the state court at the state evidentiary hearing actually found Lothery not credible. But we do have a pretty, at least somewhat reliable, prior consistent statement. Mr. Lowry's lawyer said that from the get-go, he told his lawyer that he was there with Mr. Patel, but that Mr. Alcox was not. So in other words, it was a culpatory of himself. He was there, not in culpatory of Mr. Alcox. It's what Mr. Voicy said in his declaration that from the very beginning of the case, quote unquote, that's what Mr. Lothery said. I think Lothery saw that as exculpatory because... Well, whatever. My point is it's consistent. Did the lawyer, did Mr. Voicy testify at the state hearing that you're talking about? No, he did not. Okay, so the judge didn't hear that. Right, right. But even if it were consistent, it doesn't help Lothery's credibility because Lothery was simply trying to say that he was at the scene and being at the scene of a crime does not make you guilty. He was trying to point... I'm sure it doesn't help you though, does it? I mean, it's not... It doesn't help, but that's... It's worse than saying that you don't even know, that you were never there and you don't know what happened. That's true. That's true. But I would submit though that that definitely would not be enough to convict somebody to be at the crime scene because he could have very well been a witness. But he took it beyond that. He pointed the finger at Sanjay. I was there, but Sanjay Patel shot the victim. I didn't do anything. So the last point I'd like to make is that Petitioner blames trial counsel for making a rash decision that misled him not to present an alibi defense. But as Petitioner admits, trial counsel's file did have the police reports of what these alibi witnesses said. And one of the alibi witnesses was Sean Daugherty, who actually said in the declaration, this was pointed out in the District Court's first decision, Sean Daugherty actually said that he didn't see Petitioner at the party at 7 p.m. He didn't see Petitioner there until after 8 p.m. And this crime occurred at 6 p.m. Plenty of time in that two-hour, more than two-hour time frame for Petitioner to be involved in it. So I'd just like to conclude, since I know my time is up. To find the petition in this case timely would defeat AEDPA's purpose of expediting federal habeas actions. And based on the record and the law in this case, Petitioner definitely has not proven that he has presented any new evidence or diligence and certainly has not shown that he has presented any evidence at all that would convince any court that there is more likely than not no reasonable juror would find him guilty beyond a reasonable doubt. And therefore, his actual innocence claim also fails. Unless this Court has any questions, I would submit. Thank you, Counsel. Thank you. You can have a couple minutes to. Thank you. Judge Voicy did in fact testify at the evidentiary hearing and did in fact testify that from the very beginning, his client, Mr. Lothry, told him that Alcox was not present. As to the jailhouse recordings, the important fact is not that Rick Lothry said that it was there and who pointed out that Sanjay was in the jail. The important fact is this. At closing, the DA hammered on the point, you have to remember that the actual jailhouse recordings were not presented at trial. What they presented was testimony summarizing what one person said that she heard. If you actually listen to the jailhouse recordings, something very different was said. And at closing, the district attorney hammered in, if in fact this confession is bogus, if it's unreliable, wouldn't Rick Lothry have come to him and say, why did you confess to a crime you didn't commit? When you listen to the jailhouse recordings, that's exactly what was said more than once, more than twice. And the astounding fact, again, is that Mr. Bailey could not refute that because he never listened to the jailhouse recordings, so he never bothered to get them. I have one question. The district court in this case made a finding that Alcox did not meet the actual innocence standard, but did he hold a hearing on that claim? He did not. There was no hearing, and we asked for a hearing, and no evidence was presented. So I'm not sure how he was able to conclude that. And we keep hearing from the state, and we heard this from the DA, that all of our evidence that we are now presenting is unreliable. They have yet to rebut any of it. They have yet to, in fact, when you look at Judge Garcia's findings with what we were able to present at that time, he found that young Mr. Garcia, the witness, I don't remember his first name, rebutted Carolina Gonzalez's testimony. He found that the jailhouse conversations were, in fact, consistent with a finding that Lothery was surprised that Alcox would admit to a crime he didn't commit. We were on, at that point, we had not yet found the alibi witnesses. We found the alibi witnesses as we were preparing for the new trial after the writ was granted. They would have rebutted all of that. There's nothing to rebut the alibi witnesses. When you look at all of the five different alibi witnesses, they all put Joel Alcox at a different site, far from the shooting scene. And the times vary somewhat, and they're not all totally consistent. But when do you get five people to be totally consistent on every single detail? That doesn't happen. The state's sole argument seems to be, look, he confessed, what more do we need? Well, we now know, as Justice pointed out, that, in fact, in the DNA reversals, there is a full quarter of them have faults at confessions. There's a difference. Yes, Mr. Bailey did litigate the admissibility of the confession. It wasn't coerced. It was found not to be coerced. But there's a difference between that and reliability of the confession. And this confession is as unreliable as confessions get. When you listen to it, it's hours and hours. And initially, he says, I was at a barbecue. I wasn't there. Then they keep saying, no, no, you were there. You were there. And then he keeps, he's coming off of acid, and he had been drinking to get down from acid. Then he begins saying, well, I think I was there. I think I was there. And finally, at the end, he does confess, regurgitating what they said. And let me give you an example of how they gave him the evidence. When they asked him, well, Rick Lothry had a gun, didn't he? I don't know. I don't remember. Well, he did have a gun. And where would he have gotten the gun? I don't know. Wasn't Rick Lothry's father a police officer? Yeah, I guess he was. Well, and then the police officer during this interview actually put his own gun, which was also issued by the police department, on the table and said, isn't this what the gun looked like? And he said, OK, I guess so. It was also the interrogators who drew a diagram of the motel and said, isn't this what it looked like? And isn't this what you did? And that's what he regurgitated to them at the end. And as to the standard for getting a hearing, I'm sorry that I'm not clear on that. And if the court would like me to, I would be more than willing to do further research on that and submit further briefing on that. We will look at that. And you've exceeded your time. We will consider all of this very carefully. And so we're going to submit the case now, OK? So Al Cogsby Beard is submitted.
judges: Kennelly, Wardlaw, Paez